# In the United States Court of Federal Claims

No. 25-928
Filed: July 30, 2025
Reissued: August 25, 2025[†]

|  |
|---|
| **WAVE DIGITAL ASSETS, LLC,**<br><br>*Plaintiff*,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>*Defendant.*<br><br>**and**<br><br>**COMMAND SERVICES & SUPPORT, INC.,**<br><br>*Intervenor-Defendant.* |

*Shane J. McCall*, with *Nicole D. Pottroff, John L. Holtz, Gregory P. Weber, Stephanie L. Ellis,* and *Annie E. Birney*, Koprince McCall Pottroff LLC, Lawrence, Kansas, for Plaintiff.

*Elinor J. Kim,* Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, *Albert Iarrosi*, Assistant Director, *Patricia M. McCarthy*, Director, *Brett A. Shumate*, Assistant Attorney General, Washington, D.C., with *C. Joseph Carroll*, Senior Associate General Counsel, U.S. Marshals Service, Washington, D.C., for Defendant.

*Francis E. Purcell, Jr.*, with *Joseph R. Berger,* and *Amaiya Johnson*, Thompson Hine LLP, Washington, D.C., for Intervenor-Defendant.

---

[†] This Order was originally issued under seal, (ECF No. 32), and the parties were directed to file a notice of redactions consistent with the Court's instructions. That Notice was filed on August 37, 2025. (ECF No. 37). The Court accepts all jointly proposed redactions. The sealed and public versions of this Order differ only to the extent of those redactions, the publication date, and this footnote.

**ORDER**

**TAPP, Judge.**

  Wave Digital Assets, LLC ("Wave"), fully embraces the mantra of Curtis Mayfield when he sang the lyrics "keep on keeping on."[1] This bid protest seeks to determine whether the United States Marshals Service ("USMS") erred when it awarded Command Services & Support, Inc. ("CMDSS") a contract to manage seized cryptocurrencies. (Compl. at 3, ECF No. 1; Def.'s Resp. at 4–5, ECF No. 26). In conjunction with its Complaint, Wave, seeks a preliminary injunction. (Pl.'s Mot., ECF No 7). Because Wave does not demonstrate a likelihood of success on the merits or irreparable harm, its Motion is **DENIED**.

### I. Background

  This Solicitation concerns Cryptocurrency Management and Disposal Services.[2] (Compl. at 3; Def.'s Resp. at 6). According to the Solicitation, the purpose of the contract was "to provide the full range of cryptocurrency custody, management, disposal, and consulting services that are in line with industry standards."[3] (Pl.'s Mot. at 1; Def.'s Resp. at 6). These services included, but

---

[1] CURTIS MAYFIELD, *Keep On Keeping On, on* Roots (Spotify, Rhino Entertainment Co., Jan. 1, 1971).

[2] For context, the Performance Work Statement ("PWS") explained that the U.S. Marshals Service ("USMS") is a key component of the U.S. Department of Justice (DOJ) Asset Forfeiture Program ("AFP"). (Def.'s Attachments ("Attachs.") at 60, ECF No. 26-1). "Asset forfeiture plays a critical role in disrupting and dismantling illegal enterprises, depriving criminals of the proceeds of illegal activity, deterring crime, and restoring property to victims." (*Id.*).

[3] Historically, USMS has self-managed seized/forfeited crypto assets, but this solicitation seeks to assist "USMS in managing and disposing of cryptocurrency assets, known as Class 2 – 4 cryptocurrencies." (Def.'s Attachs at 60–61). A portion of this solicitation evaluated a contractor's ability to store cryptocurrency assets by using "wallets[,]" which are essentially "virtual account[s]" from which the owner can send and receive cryptocurrency. (Compl. Exhibits ("Exs.") at 242, ECF No. 1-2).
The agency issued a separate solicitation for Class 1 cryptocurrencies. (Def.'s Resp. at 2 n.2). The PWS classifies Class 1 as "[c]ryptocurrencies that are supported by cold storage wallets and can be liquidated on most exchange platforms (e.g., Bitcoin, Ethereum, Litecoin, Tether)." (Def.'s Attachs. at. 61–62). According to the PWS, when a contractor holds cryptocurrency assets in cold storage, this means "not connected to the internet, intranet, or computer[.]" (*Id.* at 64). Class 2 is defined as "[c]ryptocurrencies that are supported by cold storage wallets but cannot be liquidated on most exchange platforms. Cryptocurrency must be swapped for a supported cryptocurrency type prior to liquidation (e.g., Bitcoin Gold, Fantom, Tron, etc.)." (*Id.* at. 61–62). Class 3 is defined as "[c]ryptocurrencies that are not supported by cold storage wallets but can be liquidated on most exchange platforms (e.g., Celo Gold, Mirror Protocol,

were not limited to, "accounting, customer management, audit compliance, wallet creation and management, private encryption key generation and management, backup, and recovery of private encryption key material." (Pl.'s Mot. at 1; Def.'s Resp. at 6). The Request for Proposals ("RFP") stated the award would be a single firm-fixed-price, indefinite delivery indefinite quantity ("IDIQ") contract for a base period of one year and four one-year options. (Pl.'s Mot. at 2; Def.'s Resp. at 6). The award would be given to the offeror whose proposal would "be most advantageous to the government" based on four evaluation factors: Factor 1 – Experience/Oral Presentation; Factor 2 – Technical Capability/Resumes; Factor 3 – Other Data; and Factor 4 – Price. (Pl.'s Mot. at 2; Def.'s Resp. at 6).

Evaluations would be conducted in two phases. For Phase I, Offerors were required to submit oral presentations for Factor 1 – Experience. (Pl.'s Mot. at 2; Def.'s Resp. at 7). The oral presentations required Offerors to address a list of thirteen questions in the RFP, demonstrate the Offeror's understanding and capability to offer/create a solution for the requirements stated in Performance Work Statement ("PWS"), and respond to "on-the-spot" challenge questions. (*Id.*). For Phase II, Offerors were to provide written submissions for Factors 2–4. (*Id.*). Factor 2 – Technical Capability/Resumes contained six subfactors: (1) Facility and Staffing; (2) Security; (3) Initial Intake; (4) Storage and Management; (5) Disposal; and (6) Resumes. (Compl. at 4; Def.'s Resp. at 7). For Factors 1 and 2, USMS would consider an Offeror's proposed approach and any associated risk, ultimately assigning a confidence rating of High Confidence, Some Confidence, or Low Confidence. (Pl.'s Mot. at 2; Def.'s Resp. at 8).[4]

Ten vendors timely submitted proposals, but only three (CMDSS, Wave, and ▮) advanced to Phase II of the procurement. (Pl.'s Mot. at 5; Def.'s Resp. at 8). The three Offerors submitted Phase II proposals and USMS opened discussions. (Pl.'s Mot. at 4; Def.'s Resp. at 8). After discussions concluded, the agency's Technical Evaluation Board ("TEP") reevaluated each of the proposals and reached the following determinations:

| Offeror | Factor 1 – Oral Presentation / Experience | Factor 2 – Technical Capability / Resumes | Factor 3 – Other Data | Factor 4 – Price | Overall Technical Rating |
|---|---|---|---|---|---|
| ▮ | Some Confidence | Some Confidence | Compliant | $30,213,140.50 | Some Confidence |

---

BOBA Token, etc.)." (*Id.* at 4). Class 4 is defined as "[c]ryptocurrencies that are not supported by cold storage wallets and cannot be liquidated on most exchange platforms. These cryptocurrencies typically require coin/token specific software for custody and transacting. Cryptocurrency must be swapped for a supported cryptocurrency type prior to liquidation (e.g., Ark, Bitcoin SV, Ravencoin, etc.)." (*Id.*).

[4] Factors 3 – Other Data and 4 – Price were essentially pass-fail factors and not particularly relevant to this litigation. (Pl.'s Mot. at 2; Def.'s Resp. at 8).

| CMDSS | Some Confidence | Some Confidence | Compliant | $23,076,450.00 | Some Confidence |
|---|---|---|---|---|---|
| Wave | Some Confidence | Low Confidence | Compliant | $19,746,500.00 | Low Confidence<br><br>Technically Unacceptable for Award |

(Pl.'s Mot. at 5; Def.'s Resp. at 8). Based on these final evaluations, both ▊ and CMDSS were technically superior in Factor 2 – Technical Capability/Resumes when compared to Wave. (Pl.'s Mot. at 5; Def.'s Resp. at 8). The USMS awarded CMDSS the contract on a best value basis. (*Id.*). USMS notified Wave of its unsuccessful offer on October 29, 2024. (*Id.*).

Wave lodged an agency-level protest alleging that: (1) CMDSS was ineligible for award because it had not procured the required licenses and registrations to perform the contract; (2) USMS improperly disregarded Wave's affirmative statement that its subcontractor's platform would support all the Class 2–4 cryptocurrency assets required by the Solicitation; and (3) USMS misinterpreted and disregarded its proposal based on a misunderstanding of Wave's proposed relationship with its subcontractors. (Pl.'s Mot. at 5 (citing Compl. Exhibits ("Exs.") at 182–88, ECF No. 1-2; Def.'s Resp. at 9 (citing Def.'s Attachments ("Attachs.") at 17–21, ECF No. 26-1)).[5] Before resolution of the first protest, Wave filed a second protest with USMS on November 21, 2024, alleging that CMDSS had an Organizational Conflict of Interest ("OCI") because it employed former USMS employees. (Pl.'s Mot. at 6 (citing Compl. Exs. at 190–91); Def.'s Resp. at 9). USMS ultimately denied both protests on November 26, 2024. (Pl.'s Mot. at 6; Def.'s Resp. at 9).

Undeterred, Wave filed a third protest on December 6, 2024, with the Government Accountability Office ("GAO"). (Pl.'s Mot. at 6; Def.'s Resp. at 9 (citing Def.'s Attachs. at 13–21)). This protest re-alleged that USMS failed to find CMDSS and ▊ technically unacceptable due to a lack of licensing with the Securities and Exchange Commission ("SEC") and Financial Industry Regulatory Authority ("FINRA"), and that the agency failed to investigate CMDSS's OCI concerns. (Pl.'s Mot. at 6; Def.'s Resp. at 9). On February 3, 2025, two months after its initial protest, Wave filed a supplemental protest alleging that USMS engaged in unequal treatment in evaluating the proposals of Wave and the other unsuccessful offeror, ▊ (Pl.'s Mot 6–7; Def.'s Resp. 9–10 (citing Def.'s Attachs. at 20–21)). GAO concluded that the agency's evaluation was reasonable and consistent with the terms of the solicitation. (Def.'s Attachs. at 20–21). GAO also determined that the USMS had in fact conducted an OCI investigation; thus, there was no basis for Wave's OCI argument. (Def.'s Attachs. at 17 n.13). Because GAO found USMS's evaluations to be reasonable, it declined to consider Wave's disparate treatment claims. (*Id.*). Wave now seeks relief in this Court.

---

[5] When citing either the Exhibits or Attachments, the page numbers correlate with the page numbers assigned by CM/ECF.

## II.   Analysis

Unconvinced by the rationale and analysis of both the agency and GAO, Wave moves for a preliminary injunction from this Court to stop contract performance. (*See generally* Pl.'s Mot.). Wave alleges that USMS: (1) deviated from the solicitation's terms when evaluating Wave's proposal; (2) failed to give Wave sufficient time to respond to discussions; (3) treated Wave and ▇▇▇ proposals unequally; (4) contradicted its evaluation; (5) deviated from the evaluation criteria regarding licensing; and (6) failed to evaluate OCI issues. (*See generally id.*). The Court ultimately finds that Wave's arguments fail.

This Court has the authority to grant preliminary injunctive relief when a plaintiff has demonstrated: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without an injunction; (3) the balance of harms leans in its favor; and (4) it is in the public's interest to grant an injunction. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). "No one factor, taken individually, is necessarily dispositive . . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). Additionally, a strong showing of one factor may overcome weakness as to others, "the absence of an adequate showing," regarding "any one factor may be sufficient" to demand denial of injunctive relief. *FMC Corp.*, 3 F.3d at 427. At a minimum, the "movant must establish *both* 'likelihood of success on the merits *and* irreparable harm' for the court to grant a preliminary injunction." *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 676 F. App'x 980, 984 (Fed. Cir. 2017) (emphasis in original) (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)).

### A.  Likelihood of Success on the Merits

For Wave to succeed on the merits of its argument, it must demonstrate that USMS's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4). This standard is achieved by proving that the procurement official's decision (1) lacked a rational basis, or (2) the procurement procedure involved a violation of regulation or procedure. *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1252 (2015).

Wave argues that USMS deviated from the terms of the solicitation and improperly disqualified its proposal. (Pl.'s Mot. at 11). Specifically, Wave highlights Section 2.4.2 of the PWS. (*Id.*). Section 2.4.2, entitled "Exchange into More Liquid Cryptocurrency," directed Offerors to propose a plan demonstrating their capability to convert unsupported cryptocurrencies into those compatible with their platform.[6] (*See* Def.'s Attachs. at 68). Wave proposed a plan to exchange unsupported assets through its subcontractor, ▇▇▇ (Compl. Exs. at 23). Wave explained that ▇▇▇ would hold any unsupported assets in "custodial hardware

---

[6] "Class 2 and Class 4 cryptocurrencies include assets that are not supported by most exchanges. In these situations, the Contractor shall provide a plan to exchange the cryptocurrency for a cryptocurrency that is supported by the Contractor's exchange platform." (Def.'s Attachs. at 68).

wallets[,]" but this could only serve as a temporary solution, as ▮▮▮ hard wallets were not covered by its insurance policy. (*Id.*). The proposal stated:

> Assets held in hard wallets are not covered by ▮▮▮ insurance policy nor included in SOC audits, and thus are not considered to be held in 'Qualified' custody. *To mitigate risk, Wave will look to convert these assets, with the permission of USMS, to supported assets as quickly as possible*.

(Compl. Exs. at 23 (emphasis added)). Wave claims it was told "that its plan was improper because it [proposed to] swapped assets and [was subsequently] disqualified from award." (Pl.'s Mot. at 11). Wave complains that it simply followed the PWS's instructions and therefore USMS's determination was both improper and "the sole reason it did not receive [the] award." (*Id.*). Wave misguides the Court's attention with this argument.[7]

After reviewing the Technical Evaluation Board ("TEB") report, it is apparent that Wave was not disqualified simply for developing and proposing a plan to swap assets. (*See generally* Def.'s Attachs. at 32–56). The evidence reveals that USMS was concerned with Wave's ability to hold unsupported assets generally, regardless of whether those assets would later be exchanged. (Compl. Exs. at 179; Def.'s Attachs. at 55). The TEB noted that Wave's proposal "relied heavily on the *immediate swapping* of non-supported assets so that they would be supported by ▮▮▮ custody platform." (Compl. Exs. at 179 (emphasis added); Def.'s Attachs. at 55). This plan did not conform to the terms of the PWS mandating that the contractor "remain capable of taking custody, and managing, all types and quantities of cryptocurrency, described as Class 2–4 without limitation, throughout the performance of this contract." (Def.'s Attachs. at 63 (Section 2.1)). In other words, Wave's self-expressed need for ▮▮▮ to swap unsupported assets "as quickly as possible" failed to consider the PWS requirement that the contractor be capable of retaining such assets indefinitely, without necessitating conversion.

Even assuming ambiguity in Section 2.1 of the PWS, Wave concedes that USMS clarified the requirements through the following Q&A's:

> Q: Once Class 3-4 cryptocurrency are approved for transfer to Custody, what if they need to be swapped prior, due to there being no support for it in wallet storage or on crypto exchanges, . . . can it be swapped first?
>
> A: Per PWS section 2.1 Custody, the Contractor shall remain capable of taking custody, and managing, all types and quantities of cryptocurrency, described as Class 2-4 without limitation, throughout the performance of this contract. Class 2-4 assets may not be swapped until an authorization document has been received.

---

[7] As an initial matter, Wave exerts little effort to demonstrate that its plan to swap assets was the "sole reason" that its proposal was disqualified. Wave fails to clearly highlight any specific provisions, page numbers, or sections. Nonetheless, the Court will consider the evidence provided to ascertain the merits of Wave's arguments.

> Q: Is it acceptable to swap less traded cryptocurrency for "Class 1" assets, then store until liquidation approval or are Class 1 assets not permitted to trade within this Class 2-4 contract opportunity?
>
> A: Per PWS section 2.1 Custody, the Contractor shall remain capable of taking custody, and managing, all types and quantities of cryptocurrency, described as Class 2-4 without limitation, throughout the performance of this contract. Class 2-4 assets may not be swapped until an authorization document has been received.

(Pl.'s Mot. at 3 (citing Compl. Exs. at 145)). The PWS expressly mandated that the contractor be able to retain all Class 2–4 assets without limitation, and USMS further reinforced and clarified that immediately swapping unsupported assets was not a viable option.

Finally, on October 24, 2024, USMS notified Wave that its plan to immediately swap unsupported assets was not a viable solution and requested an alternative approach. (Pl.'s Mot. at 4 (citing Compl. Exs. at 144–45)). Wave's response stated, "[t]aking this into account, we confirm that there is no need for an alternative solution. Our subcontractor ███ platform will support all assets, and there is no need for the swapping of assets prior to disposal or otherwise in order to meet the requirements outlined in the PWS." (Compl. Exs. at 148). Wave offered no further details. USMS found this response lacking, ultimately concluding:

> [Wave's] proposal for custody and management of cryptocurrency does not meet the requirements of the PWS. During multiple parts of the procurement process, USMS indicated that all cryptocurrency assets must remain in the same form it is seized in until authorization document is received allowing for the disposal of the asset. Even still, Wave's plan for custody was to swap assets that were not supported by their custodian for a cryptocurrency that is or liquidate for fiat. After disclosing this was not a viable resolution as previously indicated, Wave did not provide details of an alternate solution; only a conclusory statement that their custodian ███ could support all cryptocurrency assets categorized as Class 2–4 . . . This gave the TEB and [sic] overall low confidence in Wave's capabilities to be successful, even with USMS intervention at any level.

(Compl. Exs. at 180; Def.'s Attachs. at 56). The TEB's conclusion is reasonable. Wave was afforded the opportunity to explain how its subcontractor could support the assets, despite previous assertions to the contrary, or to present an alternative plan. It did neither. Therefore, Wave's claim that USMS deviated from the solicitation or improperly disqualified it from the procurement is unsupported. Wave simply failed to conform to the terms, even after clarification; Wave is unlikely to succeed on the merits in this regard.

Next, Wave asserts that USMS failed to afford adequate time to respond during discussions, specifically contending that the October 24 notification required a reply by the very next day, October 25. (Pl.'s Mot. at 11–12). While USMS provided only one day for Wave to respond, this last-minute notification was a courtesy considering that Wave intentionally submitted a proposal that deviated from the PWS's requirements. (*See* Pl.'s Mot. at 14 ("USMS

expressly stated . . . the basis for its poor rating for Wave was Wave's plan to swap unsupported assets . . . however, Wave, . . . described this plan as a deviation from the criteria.")). Wave read the PWS, knowingly submitted a non-conforming proposal, and disregarded the clarifying Q&A responses. Wave now seeks to shift blame to USMS, pointing a finger outwards while ignoring the three directed back at itself. The Court is not persuaded by this deflection; Wave is unlikely to succeed on the merits of this claim.

Wave next argues that USMS treated Wave and ▇▇▇ proposals unequally. (Pl.'s Mot. at 12–14). To support this, Wave highlights the TEB report's assessment of ▇▇▇, stating that "▇▇▇ does not provide a detailed proposal on how they will handle unsupported assets, just that they can." (*Id.* at 13 (citing Compl. Exs. at 226)). Wave compares ▇▇▇ lack of a *detailed* plan to its own lack of a plan, arguing that their proposals were "substantively indistinguishable." (*Id.* at 14). Wave essentially claims that it was penalized for the same issue that "▇▇▇ was given a pass" for. (*Id.* at 14). The Court disagrees.

A protestor who alleges unequal treatment "must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *LB&B Assoc., Inc. v. United States*, 160 Fed. Cl. 710, 721 (quoting *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020)). Alternatively, a protestor may also succeed by showing "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 132 (2020) (quoting *Off. Design Grp.*, 951 F.3d at 1372).

It is true that, like Wave, USMS noted ▇▇▇ failure to provide a detailed proposal regarding how it would manage unsupported assets. (*See* Compl. Exs. at 226). However, unlike Wave, ▇▇▇ solution for the intake of unsupported assets did not propose immediately exchanging them in violation of both the PWS terms and USMS's Q&A responses. (*Id.*). Additionally, per the TEB report, ▇▇▇ plan for unsupported assets was as follows:

> **Post Discussion question Evaluations:** ▇▇▇ *engineering group concluded they can **provide cold storage by default intake and storage of all Class 2-4 assets as provided**. New cryptocurrency assets will be [assessed] Low/Medium/High Complexity and USMS will have to determine if it is fiscally worth requesting a supporting mechanism.*

(*See* Compl. Exs. at 226 (emphasis and italicization in original)). While the details regarding cold storage may not have been fleshed out entirely, USMS looked upon this proposal favorably, stating "▇▇▇ plan for using a variety of cold storage wallets provides a great level of confidence that they will be able to store the various types of unpopular cryptocurrency that may be seized." (Compl. Exs. at 234). Stated differently, ▇▇▇ cold storage plan meant that it would be able to store all forms of Class 2–4 assets in their original forms.

In comparison, Wave's proposal makes no mention of cold storage. Initially, Wave's intake solution for unsupported assets was that ▇▇▇ would utilize custodial hardware wallets. (Compl. Exs. at 23). However, for reasons already addressed, this plan was not suitable. When USMS gave Wave its final notice on October 24, Wave's response simply stated that "▇▇▇

8

platform will support all assets, and there is no need for the swapping of assets prior to disposal or otherwise in order to meet the requirements outlined in the PWS." (Compl. Exs. at 148). Notably, Wave has neither argued nor shown in the evidence that it proposed the use of cold storage.

From the evidence supplied, ▉ had a plan for the intake of unsupported assets, which was to utilize cold storage. Although the cold storage plan may have lacked detail, it nonetheless conformed to the requirements of the PWS. On the other hand, Wave's *initial* plan did not meet the PWS's terms, and Wave's later assertion that ▉ could support all assets was unsupported by even the slightest explanation of how that would occur (for example, with cold storage). Wave's attempt to highlight a lack of details muddles reality. ▉ proposal lacked details but presented a viable solution. Wave's proposal provided neither. The proposals submitted by ▉ and Wave were distinguishable; the Court declines to delve further into the TEB's evaluation process. Wave's disparate treatment claim lacks merit.

Wave's next argument is that USMS's Evaluation was self-contradictory. (Pl.'s Mot. at 14). As previously discussed, Wave admits it its proposal deviated from the Solicitation's criteria but argues that because USMS did not initially object to Wave's plan, it should not have received a poor rating on that basis. (Pl.'s Mot. at 14 ("[Wave] described this plan as a deviation from the criteria[.]")). This argument is nonsensical. As the very next page of Wave's Motion states "[w]here an agency deviates from the stated terms for a solicitation in its evaluation, that evaluation is unreasonable and contrary to law." (Pl.'s Mot. at 15 (citing *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 391 (2011)). Overlooking Wave's deliberate non-conformance would not only contravene the very legal standards on which Wave relies but also undermine fundamental principles of procurement law. This argument is also unavailing.

Wave alleges USMS deviated from the evaluation criteria by not deeming the proposals of CMDSS and ▉ technically unacceptable with respect to licensing requirements. (Pl.'s Mot. at 15–16). The Solicitation required Offerors to "[d]escribe how [the offeror's] system ensures compliance with regulations and laws related to the selling of cryptocurrency assets." (*Id.* at 15). Wave alleges that neither CMDSS nor ▉ could obtain the licenses "by the time performance began," and therefore could not meet the requirements of the Solicitation. (*Id.*). Wave claims that there are multiple licensing requirements for contractors who engage in the selling of cryptocurrency assets, and because neither CMDSS nor ▉ had the necessary licenses at the time of their proposal, or by the time of award, they should have been disqualified. (*Id.*). The Court cannot agree.

It is apparent, from the provision Wave identified, that Offerors were to *describe* how their system would comply with the laws and regulations. Notably, the provision did not require Offerors to supply *proof* of registrations, licenses, or other forms of compliance. Further still, Wave has not supplied any evidence from the Solicitation or the PWS identifying which licenses it believes each offeror was mandated to obtain. Instead, Wave seeks to create a requirement to produce proof of licensing, when all the identified provision required was a descriptive narrative explaining how compliance would be met. The Court is not unsympathetic to Wave's zeal for compliance with the law. However, that enthusiasm does not authorize Wave to invent evaluation criteria that does not appear in the Solicitation. Wave's claim, unsupported by the current record, fails on this ground.

Finally, Wave argues that CDMSS had an OCI that rendered the award improper. (Pl.'s Mot. at 16–18). One of CMDSS's subcontractors is ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Pl.'s Mot. at 17). ▬▬▬▬▬▬▬ purportedly employs two prior USMS employees—▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, and ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.[8] (Id. at 16–18 (citing Compl. Exs. at 193, 199–203)). Wave argues that ▬▬▬▬▬▬▬▬ employment of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ "provided CMDSS with unequal and improper access to nonpublic, competitively useful information about the procurement, USMS's preference, and the competition that aided CMDSS in preparing its proposal." (Pl.'s Mot. at 18). Wave insists that CMDSS was unable to mitigate this OCI and USMS failed to "properly investigate[] and document[] its investigation to the extent it performed one." (Id. at 18).

As an initial matter, a contracting officer ("CO") "enjoy[s] great latitude in handling OCIs." *Turner Const. Co. v. United States*, 645 F.3d 1377, 1384 (2011). Under FAR § 9.504(a), a CO must "[i]dentify and evaluate potential [OCIs] as early in the acquisition process as possible" and "[a]void, neutralize, or mitigate *significant potential conflicts* before contract award." Furthermore, "[a] significant potential conflict is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders." *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (quoting *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 202 (2007)). What constitutes a significant potential conflict is under the CO's "considerable discretion[,]" and there is no requirement for the CO to document or submit a plan to neutralize any potential conflict which it deems non-significant. *See McVey Co. v. United States*, 111 Fed. Cl. 387, 408 (2013) (quoting *PAI Corp.*, 614 F.3d at 1353). Therefore, to demonstrate a CO failed to exercise appropriate discretion, the "protestor must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough." *PAI Corp.*, 614 F.3d at 1353 (quoting *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

The record shows the CO noted both ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ former employment with USMS and conducted an OCI assessment. (Compl. Exs. at 195; *see also* Notice, Ex. 1 at 2–

---

[8] The OCI memorandum asserts the following about these individuals:

▬▬▬▬▬▬▬▬▬▬▬ is the former ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬ and left the Agency 09/27/2022. As the ▬▬▬▬▬▬▬▬▬▬▬▬▬ created in the original requirements for the solicitations and awards, as well as, set on the Technical Evaluation Boards (TEBs). AFD is still using much of the same requirement for the two cryptocurrency solicitations currently underway.

▬▬▬▬▬▬▬▬▬▬▬ is the former ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬. He retired 07/16/2022. As the ▬▬▬▬▬▬▬▬▬▬▬▬▬ was responsible for identifying and overseeing the management of assets located outside of the US and assisting foreign governments with enforcing their Orders for property located within the US.

(Compl. Exs. at 195; *see also* Notice, Ex. 1 at 2–4, ECF No. 28-1).

4, ECF No. 28-1). The assessment noted that both ▮▮▮▮▮ "began working for ▮▮▮▮▮ soon after leaving USMS and did so without a cooling off period." (Notice, Ex. 1 at 2–3). The CO contacted the Office of General Counsel to discuss this issue with the ethics attorney ▮▮▮▮▮ and an attorney assigned to this cryptocurrency acquisition ▮▮▮▮▮. (*Id.* at 3). ▮▮▮▮▮ asked if there had been any attempts by either ▮▮▮▮▮ or ▮▮▮▮▮ "to reach back to [the] Asset Forfeiture Division ('AFD') USMS personnel to inquire or discuss anything pertaining to the cryptocurrency requirement and specifically as applicable to the current solicitation." (*Id.*). Finding no evidence to suggest this occurred, ▮▮▮▮▮ opined that there were "minimal risks for a potential conflict-of-interest." (*Id.*).

Further still, ▮▮▮▮▮ investigated the roles of ▮▮▮▮▮ concerning "previous cryptocurrency efforts." (Notice, Ex. 1 at 3). The CO explained "that the PWS for the current Cryptocurrency requirement[] was updated from the original to reflect a variety of technical revisions . . . brought on by rapidly changing nature of this commodity." (*Id.*). Based on this, ▮▮▮▮▮ determined the involvement, or familiarity with the original PWS, did not create an unfair advantage "as the revised PWS would be disclosed in full to the public upon release of the upcoming solicitation." (*Id.*). The assessment also considered the prior involvement of ▮▮▮▮▮ and ▮▮▮▮▮ as technical evaluators with the TEB on earlier cryptocurrency initiatives but determined that neither had "any access to pricing data other than a top-level knowledge" making this concern irrelevant. (*Id.*). Finally, the assessment notes that the last cryptocurrency source selection iterations occurred FY20 and FY21, creating "no substantiated risks" for an unfair advantage due to the time lapse between the previous and current efforts and "rapidly changing technical nature of the commodity." (*Id.*). In conjunction with the opinions of ▮▮▮▮▮ and ▮▮▮▮▮, the CO determined that the risks "for both a conflict of interest and/or and unfair competiti[ve] advantage were . . . minimal[.]" (*Id.* at 4).

Based on this evidence, the CO did in fact conduct an OCI assessment regarding ▮▮▮▮▮ but found the concerns to be minimal. At this stage of litigation, the Court lacks any "hard facts" to find this determination arbitrary or capricious, as the CO has wide discretion when making an OCI determination. *See Turner Const.*, 645 F.3d at 1384. Wave's evidentiary support consists only of the CO's assessment memorandum and the LinkedIn profiles of both employees, which does little other than to establish that both individuals were previously employed by USMS. (*See* Compl. Exs. 13–15). Based on the evidence provided, the Court cannot assume that either employee provided CMDSS with competitive information unavailable to any other offeror. This claim too, must fail. Based on this, the Court finds that Wave has not demonstrated a likelihood of success on the merits of its claims.

   B. *Irreparable Harm*

The Court turns to evaluate the irreparable harm Wave would hypothetically suffer without a preliminary injunction, which Wave alleges centers on lost profits. (*See* Pl.'s Mot. at 19). As a general principle, when a plaintiff has no ability to recoup lost profits against the United States, the harm to the plaintiff is irreparable. *KPMG LLP v. United States*, 139 Fed. Cl. 533, 537 (2018) (citing *Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 78 (2007)). This does not mean, however, that lost profits automatically constitute irreparable harm; rather "the loss of a business opportunity, coupled with an unfair procurement process, *may* result in irreparable harm to a plaintiff." *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265,

326 (2022) (emphasis added) (quoting *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 116 (2013)). "A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown." *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983). Additionally, the movant must provide facts or evidence to support its claims of harm; reliance on the arguments of attorneys will not suffice to demonstrate irreparable harm. *See Newimar, S.A. v. United States*, 163 Fed. Cl. 240, 254 (2022).

Wave argues that "deprivation of profit is an irreparable harm" for which injunctive relief is required. (Pl.'s Mot. at 19). Stated differently, Wave contends that allowing CMDSS to continue performing the contract would ultimately mean "less work for Wave" and hypothetically "less profit[.]" (*Id.*). The United States responds that outside of its assertions, Wave fails to support its claim with evidence. (Def.'s Resp. at 13 ("Wave has not offered any evidence of irreparable harm, except for argument of its counsel, which is fatal to its requests for injunctive relief.")).

Wave attaches a declaration from Mr. Timothy Clarke to its Reply as evidence to support its position.[9] (*See* Pl.'s Reply Ex. A ("Clarke Decl."), ECF No. 27-1). Mr. Clarke's declaration explains that because the work in this contract is based on the total of cryptocurrency held, the value and profit margins are "directly dependent upon the value of the cryptocurrency held by USMS." (Pl.'s Reply at 9 (quoting Clarke Decl. at 4)). Mr. Clarke explains that the contractor for this procurement will receive monthly payments for holding seized crypto; he refers to these payments as the Monthly Management Service ("MMS"). (Clarke Decl. at 3). The MMS amount is dependent on the "total portfolio value" of the seized Class 2–4 assets and may fluctuate based on changes to the assets held or the price. (*Id.*). Basically, Mr. Clarke states that the MMS awarded to the contractor is tied to the volume of assets held monthly and may fluctuate based on the actions taken by USMS thereafter. (*See id.* at 4 ("[l]iquidations now will decrease the portfolio value later, thus, when award is correctly made to Wave, it will nonetheless receive a lower profit rate in its task orders due to the lowered portfolio value by past sales unless liquidations are stopped by a preliminary injunction.")).

Unfortunately, Mr. Clarke fails to provide the Court with a means of evaluating his assertions and appears instead to merely echo arguments advanced by Wave's counsel. Not only does Mr. Clarke's factual assertions lack evidentiary support, but he also uses language to suggest that the alleged harm is merely potential rather than inevitable.[10] During oral argument,

---

[9] Mr. Clarke is a consultant for Wave and a former Special Agent for the United States Secret Service ("USSS") and the Internal Revenue Service, Criminal Investigation Division ("IRS-CI"). (*See* Pl.'s Reply Ex. A ("Clarke Decl."), ECF No. 27-1).

[10] "[T]he payout for the initial months of management and liquidation will be higher *if there is a buildup* of Class 2–4 cryptocurrency assets." (Clarke Decl. at 3 (emphasis added)). "[*I*]*f the seizures are lower than the expected seizure amounts* in the asset class, then the beginning months of contract performance are the most important in terms of being a viable opportunity." (*Id.* (emphasis added)).

Wave also suggested that the alleged harm *could* occur as opposed to being imminent (*See* Oral Argument Transcript ("OA Tr.") 46:12–18, ECF No. 30 (Wave: "Irreparable harm lies with the liquidation of assets and losing the potential for profits once those are liquidated . . . [s]o it's something *that could happen* early on in the performance.") (emphasis added)). To accept these purported facts without evidentiary support would require the Court to improperly engage speculation—something it will not do. *See Sheridan Corp. v. United States*, 94 Fed. Cl. 663, 669 (2010) (holding a plaintiff must demonstrate that, absent an injunction, *it will* suffer irreparable harm before a decision can be rendered on the merits). Because Wave's argument is unsupported by evidence, the Court is unconvinced that it faces irreparable harm.

Even assuming the Court finds Wave's allegations of irreparable harm persuasive, its failure to demonstrate a likelihood of success on the merits detracts significantly from its assertions regarding irreparable harm. *Akal Security, Inc. v. United States*, 87 Fed. Cl. 311, 319 (2009) ("[T]he strength or weakness of [Plaintiff]'s merits arguments largely determines the court's view of irreparable injury."); s*ee also OAO Corp. v. United States*, 49 Fed. Cl. 478, 481 (2001) (finding slight evidence of irreparable harm, but denying injunction where likelihood of success on the merits is also minimal). In fact, Wave's own brief cites case law explaining that lost profits are generally sufficient to find irreparable injury *when in conjunction* with "arbitrary procurement actions would deprive them of the opportunity to compete for a contract." (Pl.'s Mot. at 19 (quoting *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 552 (2011))). Here, the Court has not found arbitrary procurement actions. A failure to show likelihood of success and irreparable harm is fatal to Wave's claims at this stage. *See Amazon.com, Inc.*, 239 F.3d at 1350 (holding that a plaintiff must establish likelihood of success on the merits and irreparable harm.). *Altana Pharma AG v. Teva Pharm. USA, Inc*, 566 F.3d 999, 1005 ("Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction.").

### III.  Conclusion

At this preliminary juncture, Wave has failed to successfully meet its burden for the fourth time. For the stated reason, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction, (ECF No. 7). The Court **ORDERS** the parties to meet and confer and file a Joint Status Report proposing redactions to this Order by **August 13, 2025**.

The Court hereby establishes the following briefing schedule for the parties' cross-motions for judgment on the administrative record:

| Event | Deadline |
|---|---|
| Administrative Record filed in CM/ECF | August 5, 2025 |
| Plaintiff's Motion for Judgment on the Administrative Record | September 9, 2025 |
| Defendant and Intervenor-Defendant's Response Briefs/Cross-Motions | October 14, 2025 |
| Plaintiff's Reply/Response Brief | October 29, 2025 |
| Defendant and Intervenor-Defendant's Reply Briefs | November 13, 2025 |
| Joint Appendix filed in CM/ECF | November 21, 2025 |
| Oral argument, if any | TBD |

**IT IS SO ORDERED.**



s/   David A. Tapp
DAVID A. TAPP, Judge