# In the United States Court of Federal Claims

No. 25-928
Filed: May 13, 2026
Reissued: June 1, 2026[†]

<table>
<tr><td>

**WAVE DIGITAL ASSETS, LLC,**

        ***Plaintiff,***

**v.**

**THE UNITED STATES,**

        ***Defendant.***

**and**

**COMMAND SERVICES & SUPPORT, INC.,**

        ***Intervenor-Defendant.***

</td></tr>
</table>

*Shane J. McCall*, with *Nicole D. Pottroff*, *John L. Holtz*, *Gregory P. Weber*, *Stephanie L. Ellis*, and *Annie E. Birney*, Koprince McCall Pottroff LLC, Lawrence, KS, for Plaintiff.

*Elinor J. Kim*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, *Albert Iarrosi*, Assistant Director, *Patricia M. McCarthy*, Director, *Brett A. Shumate*, Assistant Attorney General, with *C. Joseph Carroll*, Senior Associate General Counsel, U.S. Marshals Service, Washington, D.C., for Defendant.

*Francis E. Purcell, Jr.*, with *Joseph R. Berger*, and *Amaiya Johnson*, Thompson Hine LLP, Washington, D.C., for Intervenor-Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**TAPP, Judge.**

The United States Department of Justice ("DOJ"), jointly with the United States Marshals Service ("USMS" or "Agency"), urges the Court to affirm an award decision related to a contract

---

[†] This Opinion was originally issued under seal, (ECF No. 65). The Court provided parties with the opportunity to submit proposed redactions. The Court accepts all proposed redactions. (See Joint Status Report, ECF No. 68-2). The sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

for the security and storage of seized cryptocurrency. Standing alone, this unremarkable proposition could result in the issuance of a garden-variety protest decision much like that below. What sets this litigation apart is that during the pendency of this protest, the United States charged an employee of the awardee with theft of more than $46 million in cryptocurrency being held for the USMS.

The Court is narrowly constrained by jurisdiction, statute, and precedent; the Agency, however, retains alternative solutions it has not chosen to pursue. The Agency's refusal to act stands in tension with the seriousness of the events unfolding around the award. Rather than remaining stoically silent, the Government could have simply asked for a brief stay or voluntary remand to consider its options. It did nothing. Only now, at the Court's insistence, has it responded at all. It stated that, "this individual is alleged to have stolen the cryptocurrency based on an insider type of position where he allegedly abused his access and *no amount of precautions could have necessarily prevented this type of threat . . . .*" (Hr'g Tr. at 10:9–13 (emphasis added), ECF No. 63). This belated explanation does little to assuage a genuine concern regarding rampant fraud within our government and yet the United States seems inexplicably committed to a flawed procurement that has not achieved its stated objective.[1]

Even so, the Court's role is narrower than the circumstances might invite. Constrained as it is, the Court must resolve the merits based on the record as it existed at the time of award— before the alleged theft. On that record, this protest fails. Plaintiff, Wave Digital Assets, LLC ("Wave"), has not shown that the USMS's initial decision was fatally flawed, despite the subsequent events. Wave's Motion for Judgment on the Administrative Record, (Pls.'s MJAR, ECF No. 42), is **DENIED**. The United States' and Intervenor-Defendant's, Command Services & Support, Inc. ("CMDSS"), Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 48; Interv.-Def.'s xMJAR, ECF No. 47), are **GRANTED**. Resolution of issues relating to the administration of this ill-fated contract must wait.

## I.    Background

Asset forfeiture is an essential component of federal law enforcement efforts. "The USMS is the primary custodian of seized assets[,] . . . [including] cryptocurrency[,]" for the federal asset forfeiture program. (Administrative Record ("AR") 3, ECF Nos. 33, 34). The USMS Solicitation issued a request for proposals ("RFP" or "Solicitation") for the management

---

[1] The GAO estimates that the United States's loses between $233 billion and $521 billion annually to fraud. *See https://www.gao.gov/products/gao-24-105833* [https://perma.cc/R3GW-866D] (last visited May 13, 2026). Some procurement related fraud is well-documented. *See* CRAIG WHITLOCK, FAT LEAONARD: HOW ONE MAN BRIBED, BILKED, AND SEDUCED THE U.S. NAVY (Simon & Schuster, 2024) (multi-million dollar fraud relating to Navy husbanding contracts).

and disposal of Class 2–4 cryptocurrency assets.[2] (AR 83–86). The awardee was required to provide custodial, managerial, disposal, and consulting services pertaining to cryptocurrency in line with industry standards. (AR 150). These services included, but were not limited to: "accounting, customer management, audit compliance, wallet creation and management, private encryption key generation and management, backup, and recovery of private encryption key material." (*Id.*). The RFP contemplated a firm fixed price, single award, indefinite delivery indefinite quantity contract for a base period of one year and four, one-year options. (AR 85, 89). The USMS would make the award on a best-value basis. (AR 141).

The USMS instructed offerors to submit their proposals in four volumes: Factor 1– Experience (Oral Presentation); Factor 2–Technical Capability/Resumes; Factor 3–Other Data; and Factor 4–Price. (AR 141). The contract would be awarded to the "responsible company whose proposal conforming to the Solicitation will be most advantageous to the government" based on the four stated factors "and an approved Teaming Agreement, if applicable, in addition to a compliant Quality Control Plan [("QCP")]." (*Id.*). Additionally, the Solicitation explained that the "**non-price factors, when combined, are significantly more important than price.**" (*Id.* (emphasis in original)). The USMS would assign confidence ratings for Factors 1 and 2 based on the offeror's proposed approaches and the risks associated with those approaches to assess the likelihood of successfully performing the work and meeting the USMS's objectives, and provided the following table:

| Table 1 – Confidence Ratings | |
|---|---|
| High Confidence | The Government has *high confidence* that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with little or no Government intervention. |
| Some Confidence | The Government has *some confidence* that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with *some* Government intervention. |
| Low Confidence | The Government has *low confidence* that the Offeror understands the requirement, does not propose a sound approach, or will be successful in performing the contract even with Government intervention. |

---

[2] RFP No. 15M50024QA4400003. (AR 89). The Solicitation defines Class 2–4 cryptocurrencies as follows: Class 2: "[c]ryptocurrencies that are supported by cold storage wallets but cannot be liquidated on most exchange platforms. Cryptocurrency must be swapped for a supported cryptocurrency type prior to liquidation[;]" Class 3: "[c]ryptocurrencies that are not supported by cold storage wallets but can be liquidated on most exchange platforms (e.g., Celo Gold, Mirror Protocol, BOBA Token, etc.)[;]" and Class 4: "[c]ryptocurrencies that are not supported by cold storage wallets and cannot be liquidated on most exchange platforms. These cryptocurrencies typically require coin/token specific software for custody and transacting. Cryptocurrency must be swapped for a supported cryptocurrency type prior to liquidation (e.g., Ark, Bitcoin SV, Ravencoin, etc.)." (AR 150–51).

(AR 142–45).

The USMS structured the procurement in two phases: Phase I evaluated Factor 1 and Phase II evaluated Factors 2–4. Factor 1–Experience (Oral Presentation) was divided into three subfactors: (A) the oral presentation; (B) the demonstration; and (C) on-the-spot questions. (AR 142–43). Factor 2–Technical Capability/Resumes required offerors to address in writing five subfactors: (1) Facility and Staffing; (2) Initial Intake; (3) Storage and Management; (4) Disposal; and (5) Resumes. (AR 143–44). Factor 3–Other Data required offerors to provide various forms, Organizational Conflict of Interest ("OCI") certification, Quality Control Plan, and a Teaming Agreement (if applicable). (AR 144). Factor 4–Price required offerors to submit original price schedules stating fixed prices for specified bands of transactions. (AR 145).

Ten vendors timely submitted proposals, but only three advanced to Phase II of the procurement: Wave, CMDSS, and ███████████████████. (AR 1975, 2074). Following the Technical Evaluation Board's ("TEB") evaluation of proposals, the Contracting Officer ("CO") determined that discussions were necessary and held discussions from June 26, 2024, to October 25, 2024. (AR 1975–76). After discussions concluded, the TEB reevaluated each of the proposals and reached the following conclusions:

| Offeror | Factor 1 – Oral Presentation / Experience | Factor 2 – Technical Capability / Resumes | Factor 3 – Other Data | Factor 4 – Price | Overall Technical Rating |
|---|---|---|---|---|---|
| ██████ | Some Confidence | Some Confidence | Compliant | ██████████ | Some Confidence |
| CMDSS | Some Confidence | Some Confidence | Compliant | $23,076,450.00 | Some Confidence |
| Wave | Some Confidence | Low Confidence | Compliant | ██████████ | Low Confidence<br><br>Technically Unacceptable for Award |

(AR 2075). Based on these evaluations, the CO determined it would be in the best interest of the Government to award the contract to CMDSS rather than ██████ on a best value basis, finding that CMDSS presented a technically superior and lower-priced offer among the two technically acceptable proposals. (AR 2072–86).

On October 29, 2024, the USMS awarded the contract to CMDSS and notified Wave of its unsuccessful offer. (AR 2095, 2212). Wave subsequently requested and received a debrief from the USMS, which included the TEB's evaluation of Wave's proposal. (AR 2224–26). On November 8, 2024, Wave filed a protest with the agency alleging that: (1) CMDSS was ineligible for award because it had not procured the required licenses and registrations to perform

the contract; (2) the USMS improperly disregarded Wave's assurances that its subcontractor, ███, could support all the Class 2–4 cryptocurrency assets required by the Solicitation; and (3) USMS misevaluated its proposal based upon a misunderstanding of Wave's proposed relationship with its subcontractors. (AR 2287). Soon after, Wave filed a supplemental protest with the agency alleging that CMDSS had an OCI arising from the employment of ███ ███ by one of its subcontractors, ███. (AR 2298). The USMS denied both agency-level protests. (AR 2300–04).

On December 6, 2024, Wave filed a protest with the Government Accountability Office ("GAO") alleging that the USMS should have found CMDSS and ███ technically unacceptable due to their lack of licensing with the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"), and that the agency failed to adequately investigate the OCI concerns involving CMDSS. (AR 2305). Approximately two months later, Wave filed a supplemental protest alleging that the USMS conducted unequal evaluations of the proposals submitted by ███ and Wave, particularly regarding ███ ability to support Class 2–4 cryptocurrencies. (AR 3039). The GAO's March 14, 2025 decision denied these protests, finding the Agency's evaluations to be reasonable and consistent with the terms of the Solicitation. (AR 3096–104). Wave filed this current protest two and a half months later. (Compl., ECF No. 1).

Along with its protest, Wave sought a preliminary injunction, (*see* Pl.'s Mot., ECF No. 7), which the Court denied before setting a briefing schedule that concluded in mid-January 2026. *Wave Digital Assets, LLC v. United States*, No. 25-928, 2025 WL 2475370, at *1 (Fed. Cl. July 30, 2025). Two weeks after the close of briefing, Wave filed a notice informing the Court of the Government's investigation into CMDSS's alleged theft of cryptocurrency entrusted to it by the USMS.[3] (*See* Pl.'s First Notice, ECF No. 56). In the notice, Wave included its request for involvement to the DOJ Office of the Inspector General ("OIG"). (*See id.* Ex. A, ECF No. 56-1). Wave's request to the OIG disclosed the following:

> Recent investigative reporting and independent blockchain-forensic analysis, detailed in numerous articles attached as Exhibit A, describe a scheme in which an individual allegedly boasted on Telegram about accessing and draining wallets associated with U.S. government seizures, activity that ultimately enabled investigators to trace on-chain transactions back to USMS seized assets. The claimed losses from this alleged theft are immense,

---

[3] As explained below, the Court reviews bid protests and makes necessary factual findings on an administrative record. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009); *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). Except in limited circumstances, that record is confined to what was before the agency at the time of decision, a restriction designed to prevent courts from using new evidence to "convert the 'arbitrary and capricious' standard into effectively *de novo* review." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1331 (Fed. Cir. 2018) (quoting *Axiom*, 564 F.3d at 1379–80). The Court recounts the post-decision procedural history here not as a factual determination, but to ensure full transparency regarding the materials filed of record.

estimated to be tens of millions of U.S. dollars, although the exact full scope of loss is not yet known. Such a loss under the management of a government contractor would be troubling on its own, but the alleged identity of the apparent perpetrator makes this matter of the utmost alarm. Public reporting further indicates that the individual allegedly responsible is closely related via familial connection to a principal associated with Command Services & Support ("CMDSS"), the very contractor selected by USMS to manage higher-risk Class 2–4 seized digital assets. These allegations are not mere Internet rumormongering. Law-enforcement investigations are reportedly ongoing at this very moment due to the seriousness and credibility of the claims in question.

(*Id.* at 1–2). The United States did not respond. It neither contested the accuracy of the accusations, moved to strike or seal Wave's filing, nor took voluntary corrective action.[4]

On April 14, 2026, a Grand Jury for the Eastern District of Virginia ("EDVA") charged John Dean Daghita, a.k.a. "Lick," an employee of CMDSS, with multiple counts related to the theft of over $46 million in cryptocurrency entrusted to his employer ("the Indictment").[5] (*See* Pl.'s Second Notice, ECF No. 60).[6] The Indictment alleges that Daghita used stolen cryptocurrency to purchase a Lamborghini, travel to the Caribbean, use of a yacht and villa, and hire a bodyguard and private chef. (*Id.* at 11). Law enforcement apprehended Daghita in St. Martin while in possession of $240,000 in currency representing proceeds of stolen cryptocurrency and multiple hardware wallets containing stolen cryptocurrency. (*Id.* at 11–12). Aside from the theft related charges, the Indictment seeks forfeiture of not less than $46,114,909.46. (*Id.* at 16). The Indictment remains pending.

Shortly before issuing this opinion, the Court inquired of the parties regarding the impact, if any, of the alleged the resulting Indictment. (Hr'g Tr. at 10:21–12:07). The United States urged the Court to affirm the award decision couching the alleged misconduct of the awardee's employee as a matter of contract performance rather than an issue affecting the contract award.

---

[4] Nor has the United States moved to strike or seal two related notices subsequently filed by Wave. (Pl.'s Second Notice, ECF No. 60; Pl.'s Third Notice, ECF No. 61). They remain, accordingly, part of the materials before the Court, though *not* part of the AR upon which the Court evaluates the merits of the protest. (*See* Pl.'s Second Notice; Hr'g Tr., ECF No. 63).

[5] Wave's Second Notice is not consecutively paginated; therefore, the page numbers refer to those assigned by CM/ECF.

[6] The name "John Dean Daghita" does not appear in the AR. The name ▮▮▮▮▮▮▮ appears frequently. (*See, e..g.* AR 604, 1383, 1424, 1504 (referencing ▮▮▮▮▮▮▮)). John Dean Daghita is the defendant in the EDVA Indictment. (*See* Pl.'s Second Notice at 5, 10). CMDSS allegedly hired him as a subject matter specialist in cryptocurrency in January of 2025. (*Id.* at 8–9). Appearances in the AR of ▮▮▮▮▮▮▮ are believed to reference the ▮▮▮▮▮▮▮, a separate person. (*See* AR 1424, 1504).

(*Id.* at 12:8–21 (Counsel for the United States affirming the USMS's position that the matter is a "contract administration issue . . . [and] not meaningful for the Court to consider[.]")).[7] The Court agrees.[8] The alleged theft relates to the performance of the contract, not the agency's award decision, and thus falls outside the scope of what the Court may consider in resolving this protest.

## II.    Analysis

Wave alleges that the USMS made numerous errors in its evaluation of offers under the Solicitation. (*See generally* Compl.; Am. Compl., ECF No. 41). Each of Wave's arguments have been considered, but they do not form a basis to overturn the USMS's decision.

### A.  Jurisdiction and Standard of Review

The Court typically reviews agency procurement decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA standard, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013).

Judicial review of agency action under the APA typically proceeds on two tracks; the Court could find: (1) the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the agency's procurement procedure involved a violation of regulation or statute. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). To obtain relief, after showing that the procuring agency violated the law or acted arbitrarily and capriciously, the protester must also show that the agency's violation was prejudicial. *Glenn Def. Marine (ASIA)*, 720 F.3d at 907. This standard is "highly deferential." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). "Under the 'arbitrary and capricious' standard[,] the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted). The Court may not substitute its own judgment for that of the agency. *Id.* But the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Even so, a "protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a

---

[7] Fourteen days after the Hearing, the United States formalized its position by filing a Notice reiterating its view that the alleged misconduct concerns contract administration rather than the propriety of the award decision and continuing to urge the Court to affirm the award. (*See* Def.'s Notice, ECF No. 64).

[8] Claims regarding contract administration cannot be brought under the Tucker Act. 28 U.S.C. § 1491(b)(1). Such claims fall under the Contract Disputes Act. 41 U.S.C. § 7101 *et seq.*; *see also Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995) ("When the Contract Disputes Act [("CDA")] applies, it provides the exclusive mechanism for dispute resolution[.]").

relatively high degree of discretion, and greater still, where . . . the procurement is a 'best-value' procurement." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

When reviewing an agency's procurement decisions, the Court is expected to apply a "presumption of regularity" and avoid substituting its own judgment for that of the agency. *See Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018); *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003). Additionally, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). "For that reason, procurement decisions 'invoke[] 'highly deferential' rational basis review[.]'" *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (citation omitted).

All parties move for judgment on the Administrative Record. *See* RCFC 52.1. Unlike the standard applied in summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see also* RCFC 56. Rather, the Court's inquiry focuses on whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

Well-founded concerns, premised on the now-apparent vulnerability of seized cryptocurrency entrusted to contractors, present issues arising mid-performance. That concern, however legitimate, does not justify relief under the Court's bid protest jurisdiction. Bid protest review focuses on, and is limited to, the procurement official's decision or the procurement procedure rather than subsequent events occurring during contract performance. *Glenn Def. Marine (ASIA)*, 720 F.3d at 907. As it relates to the contract under which the alleged theft occurred, Wave lacks privity with the United States, and that absence of privity forecloses any claim under the CDA. The CDA provides a remedial path only for "contractors," meaning entities in direct contractual relationship with the government. *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1369 (Fed. Cir. 2009). Wave was not the awardee and never entered into a contract with the USMS; accordingly, it could not have asserted a CDA claim even if it believed the agency's conduct during performance was improper. *See Admiralty Constr., Inc. v. Dalton,* 156 F.3d 1217, 1220 (Fed. Cir. 1998) (limiting CDA claims to contractors). Accordingly, Wave's claims fall exclusively under the Court's review of the CO's award decision.

### B.  Discussions and Timing

Wave's primary argument relates to discussions held with the offerors. (Pl.'s MJAR at 18–29). First, Wave asserts that the USMS engaged in misleading discussions by failing to provide Wave with timely notice of concerns in its proposal. (*Id.* at 20–23). Next, Wave alleges that the USMS did not give Wave a meaningful opportunity to respond to its final discussion requests. (*Id.* at 23–27). Third, Wave argues that these errors were prejudicial. (*Id.* at 27–29).

Section 2.1, "Custody," of the Performance of Work Statement ("PWS") stated that the "Contractor shall remain capable of taking custody, and managing, all types and quantities of cryptocurrency, described as Class 2-4 without limitation, throughout the performance of this contract." (AR 152). Wave's proposal indicated that its subcontractor, ▮▮▮▮, would be responsible for "custodial solutions[;]" specifically, the storage of seized cryptocurrency assets from the USMS on its platforms.[9] (AR 1510, 1524–25). If specific assets were not supported by ▮▮▮▮ storage platforms, Wave proposed that "▮▮▮▮ will use custodial hardware wallets as an intake solution." (AR 1525). However, Wave acknowledged that this approach would not constitute "Qualified" custody, as such hardware wallets are neither covered by ▮▮▮▮ insurance policy nor included within its SOC audits. (AR 1525).

Consistent with this limitation, during the first round of discussions on June 26, 2024, the USMS advised that Wave's proposed approach was insufficient, as it did not meet the PWS requirements for insured custody and inclusion in SOC audits. (AR 1951, 1960). To address this deficiency, Wave proposed swapping unsupported assets into more liquid, widely supported assets, stating:

> Wave understands that, per the PWS, USMS expects that many or all of the Class 2 and Class 4 assets cannot be liquidated on or supported by the major exchanges/platforms, and expects that Wave will exchange such USMS Assets for assets that are supported by major exchanges/trading platforms (a "**USMS Asset Swap**"). Wave expects that many assets that are not supported by the ▮▮▮▮ platform ("**Unsupported Assets**") will also not be supported by major exchanges/trading platforms. Accordingly, Wave generally expects that many of the Unsupported Assets will be converted into assets supported by ▮▮▮▮ ("**Supported Assets**"), per the PWS and as instructed by USMS.

(AR 1952 (emphasis in original)). It is at this point, Wave alleges, that the USMS "came under the impression that Wave planned to immediately swap unsupported assets upon receipt *without USMS approval*." (Pl.'s MJAR at 21 (emphasis added)).

The USMS held a second round of discussions with Wave, specifically asking about "the fee structure associated with liquidating cryptocurrency assets[, whether] fees [would be] taken directly from the asset[, and] if so, at what percentage rate in basis points." (AR 1966). Wave makes two points from this inquiry, first that the USMS acknowledged these were indeed 'discussions'" and second, that the inquiry failed to provide any indication that Wave's "unsupported assets swapping plan was an issue." (Pl.'s MJAR at 21–22).

Finally, the USMS held a third round of discussions, where it stated the following:

> Your responses to questions 3, 6, 9, and 12 require the swapping of cryptocurrency assets for types supported by the BitGo platform to meet

---

[9] Wave's proposal identified ▮▮▮▮ as "a US-based leader in digital asset security and custody" whose platform is capable of instantly creating "wallets and addresses to . . . receive and segregate assets for custody and reporting." (AR 1511, 1514).

insurance requirements, SOC requirements, creation of wallet address and notifications of non-supported by ▮▮▮▮ platform and returns of assets not supported by ▮▮▮▮ platform. As indicated by PWS sections 1.3 Objective, 2.1 Custody, 2.3.10.1 Use of Government Assets, 2.4.2 Exchange into More Liquidate Crypto and Q&A responses posted on 04/11/2024 and 04/17/2024 (listed below) this is not a viable solution because the PWS does not permit swapping of assets prior to disposal. <u>Do you have an alternative solution?</u>

**<u>A response is required NLT Friday, October 25th at 5:00 pm ET.</u>**

(AR 1969 (emphasis in original)). That same day, Wave responded, stating:

> Taking this into account, we confirm that there is no need for an alternative solution. Our subcontractor ▮▮▮▮ platform will support all assets, and there is no need for the swapping of assets prior to disposal or otherwise in order to meet the requirements outlined in the PWS.

(AR 1971). Despite Wave's affirmation of ▮▮▮▮ abilities, the USMS did not award it the contract.

The USMS's debrief included Wave's portion of the TEB report. (AR 2908). The TEB report provided several reasons for the rating received. (AR 2907–08). Importantly, the TEB noted a "Confidence Decrease" in Wave's proposal, stating:

> Assets held in hardware wallets are not covered by ▮▮▮▮ insurance policy nor included in SOC audits. This is a significant risk since these assets are unaudited and uninsured **(risk)**. We need to know which potential hardware wallets are being considered (are they based in US), and we need detailed info on the security measures and protocols in place to protect these assets (how are the wallet addresses generated and how are these assets monitored). To mitigate this risk, Wave is proposing to convert these assets with the permission of USMS. This does not meet the PWS requirements. Assets need to be held in its original form until forfeiture **(risk)**[.]

(*Id.* (emphasis in original)). The USMS went on to discuss the effect that the rounds of discussions had on the evaluation:

> **Post Discussion Questions Evaluation (1st Round):** Wave expects that any unsupported assets will be exchanged via USMS Asset Swaps, sold, or burned and will be supported on ▮▮▮▮ custody platform and does not plan the use of hardware wallets. This is not a viable solution for the USMS as assets must remain in their current form until an authorizing document is received during the adjudication of the case **(risk)**.
>
> **Post Discussion Question Evaluation (2nd Round):** After repeatedly being informed that the swapping and/or converting of cryptocurrency assets to use their identified custodian was not a viable option, Wave indicated that their custodian, ▮▮▮▮, would be able to support all cryptocurrency assets, thus

being able to use ▮▮▮▮ platform for intake. However, Wave failed to provide any details related to how this is possible and how this would change their proposal. Furthermore, the list of supported assets on ▮▮▮▮ website ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ shows they do not support numerous cryptocurrency assets categorized as Class 2-4 (e.g., Bitcoin SV, Ark, VeThor, VeChain, Hashflow). There is low confidence that Wave would be successful, even with government intervention.

(AR 2908).[10] It is primarily from this chain of events that Wave's contentions arise.

1. The USMS's discussions were not misleading.

Wave argues that the USMS's discussions with Wave were misleading. (Pl.'s MJAR at 20–23). Wave claims that the USMS first "came under the impression that Wave planned to immediately swap unsupported assets upon receipt without USMS approval" after the first round of discussions. (*Id.* at 21). Wave argues that when the USMS initiated a second round of discussions, the CO was obligated to identify concerns with Wave's proposal, including any deficiencies, significant weaknesses, or adverse past performance information to which Wave had not yet had an opportunity to respond. (*Id.* (citing FAR 15.306(d)(3))).

The United States argues that discussions are not misleading unless they misdirect the offeror as it revises its proposal or "are incorrect, confusing[,] or ambiguous." (Def.'s xMJAR at 13 (quoting *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 670 (2010) and *Greenland Contractors I/S v. United States*, 131 Fed. Cl. 216, 225 (2017))). The United States asserts that the only instance of misleading arose when Wave asserted "that ▮▮▮▮ could support all cryptocurrency assets[,]" which was determined not to be accurate based on the USMS's review of ▮▮▮▮ website. (*Id.* at 14). The Court agrees with the United States.

If the Government determines that discussions should be held, it must hold discussions with each offeror in the competitive range of a negotiated procurement. FAR 15.306(d)(1). In addition, the CO should:

> [I]ndicate to, or discuss with, each offeror . . . deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The [CO] also is encouraged to discuss other aspects of the offeror's proposal that could . . . be altered or explained to enhance materially the proposal's potential for award.

FAR 15.306(d)(3). Discussions should be meaningful, but "they do not require the agency to identify each and every item that could be raised as to improve its proposal." *iAccess Tech., Inc. v. United States*, 143 Fed. Cl. 521, 537 (2019) (citing *Carahsoft Tech. Corp. v. United States*, 86

---

[10] While the TEB Report's second Post Discussion Question Evaluation includes the characterization of "(2nd Round)," this more accurately refers to the third round of discussions which occurred on October 24, 2024. Commentary on the second round of discussions, which occurred on September 6, 2024, do not appear in the TEB report. (*See* AR 2908).

Fed. Cl. 325, 343 (2009)). Furthermore, the CO sets the scope and extent of discussions as a matter of judgment. FAR 15.306(d)(3). This discretion, however, does not give the agency a license to mislead an offeror. *DMS All-Star*, 90 Fed. Cl. at 669–70.

In this case, PWS § 2.1 (Custody) covered the contractor's custodial obligations under the contract. (AR 152). Specifically, Section 2.1 explains that "[t]he seizure of assets is often completed with little to no notice" and therefore explicitly requires the Contractor be "capable of taking custody, and managing, all types and quantities of cryptocurrency, described as Class 2–4 without limitation" (*Id.*). Additionally, PWS § 2.3.10.1 (Use of Government Assets) provided that "[t]he Contractor shall not swap, stake, pledge, hypothecate, borrow, invest, assign, convey, lend, or make other use of Government assets in the Contractor's possession, nor shall any cryptocurrency held for the Government be assigned for the benefit of creditors." (AR 155).

PWS § 2.4 (Disposal) established methods through which the contractor could dispose of cryptocurrency assets following approval. (AR 156). Once the USMS determined that a specific cryptocurrency was approved for disposal, it would notify the contractor which assets to dispose of. (*Id.*). PWS § 2.4 provided several methods of disposal, including: 1) direct exchange from cryptocurrency into fiat currency; 2) exchange into a more liquidate form of cryptocurrency which would subsequently be exchanged for United States dollars; or 3) returning the asset to the agency. (*Id.*). Regarding these methods, the PWS specifically noted that many Class 2 and Class 4 assets were not supported by most exchanges and therefore stated that "[i]n [those] instances, the Contractor shall provide a plan to exchange the cryptocurrency for a cryptocurrency that is supported by the Contractor's exchange platform." (AR 157). If the contractor determined that the disposal methods were not feasible, it would be required to provide a written explanation of mitigating factors and provide an alternative method, explanation of the choice, and any resulting changes in pricing. (AR 156). Notably, these disposal methods are available to the contractor only after Government approval.

Wave's initial plan to manage unsupported assets was to use custodial hardware wallets, which it acknowledged fell short of "Qualified" custody. (AR 1525). As a mitigation measure, Wave proposed converting such assets, subject to the USMS's approval, into supported assets "as quickly as possible." (*Id.*). However, this approach is inconsistent with the PWS requirement that the contractor be capable of taking custody of, and managing, all types and quantities of cryptocurrency, including Class 2–4 assets, without limitation. (*See* AR 152). Because Wave elected not to offer a custody plan that met the requirements of the PWS, the USMS could have rejected Wave's proposal at this juncture. *See* FAR 15.305(a) (stating that agencies must evaluate proposals "solely on the factors and subfactors specified in the solicitation"); *see also Ashbritt, Inc. v. United States*, 87 Fed. Cl. 344, 374 (2009) ("[P]roposals must be evaluated in accordance with the terms of the solicitation."). Instead, the TEB, having "identified significant concerns within all the solutions proposed," decided to open discussions. (AR 1992).

For example, Question 3 of the USMS's discussions asked Wave whether it could obtain insurance coverage for all assets, as required by the PWS, given that its proposal indicated that some assets (those not supported by ▮▮▮ custody) would be stored in uninsured hardware wallets. (AR 1951). Wave's response stated that hardware wallets would no longer be required because:

12

> [A]ny Unsupported Assets will generally have been (i) converted to a Supported Asset in an Asset Swap; (ii) otherwise sold, with proceeds returned to USMS or held in stablecoins; or (iii) burned. And, to the extent any unique Unsupported Assets exist for which Wave and USMS believe it would be prudent for USMS to maintain in their current form (and not swap, sell, or burn them), and if ███ is permitted by its regulators to support such assets, the appropriate insurance coverage will be provided.

(AR 1953–54). Essentially, Wave planned to convert unsupported assets into supported assets, sell them and return or hold the cash, or get rid of them entirely, effectively eliminating the need for insurance. Only in those "unique" cases, where an asset was required to remain in its original form, would "the appropriate insurance coverage" be provided, though how Wave would do this, given that its hardware wallets were uninsured, was absent from the explanation. While the Court agrees that the TEB's question, like the others Wave identified, never explicitly informed Wave that its plan to swap cryptocurrency was inadequate, it is equally true that the TEB never indicated that such a plan could meet the requirements of the PWS.[11]

Wave's suggestion that the USMS's questions regarding the swapping of unsupported assets indicated an interest in its proposed approach is equally unsupported, particularly given that swapping was, in any event, one of the many functions the agency expected contractors to perform upon receiving Government approval to dispose of certain cryptocurrency assets. (*See* Pl.'s Resp. at 8, ECF No. 50). Nothing in the record supports Wave's allegation that the USMS misled it.

  2.  The USMS's discussions were meaningful.

---

[11]  Several additional questions that have been identified by Wave include the following:

> **USMS Question 6:** Proposal states that assets held on hardware wallets are not included in SOC audits. This is not a viable solution, what other options are there?
>
> . . .
>
> **USMS Question 9:** Please provide details on how wallet addresses are created and specify the names of the wallet providers when using a custodial hardware wallet. Will USMS be notified if the asset is not supported on ███ platform?
>
>  . . .
>
> **USMS Question 12:** How are assets, not supported by ███, custody platform returned?

(AR 1960–64 (emphasis in original)).

Continuing along its line of reasoning, Wave asserts that the USMS failed to give Wave a meaningful opportunity to respond. (Pl.'s MJAR at 23–27). Specifically, Wave argues that the USMS waited until October 24, the third round of discussions, to raise concerns about Wave's plan for swapping cryptocurrencies and subsequently only allowed "a single day to completely retool" its approach. (*Id.* at 24). Wave claims this timeframe was unreasonable as the USMS's questions concerned "aspects of practically every specific requirement under the PWS." (*Id.* at 25). Next, Wave belabors the Court with explanations of how difficult it would be to revise its proposal, the amount of time consumed to develop its original proposal, and how Wave bears no fault in this regard. (*Id.* at 26–27).

The United States rebuts these arguments by first pointing out that Wave "knowingly submitted a proposal that deviated from the PWS requirements." (Def.'s xMJAR at 12). Specifically, the United States notes that Wave's proposal acknowledged that it relied on a deviation from the terms of the PWS, stating that:

> [S]ome obscure tokens requiring hardware wallet solutions would not be feasible under the proposed plan included in the Proposal. In order to breach the gap for these obscure tokens, Wave would request a permitted deviation from the Proposal for such specific tokens for a period of up to 3 months upon initial transfer, to convert them into an asset that would be viable to hold through/by a qualified custodian.

(*Id.* (quoting AR 1611–12)).[12] According to the United States, this plan directly violates section 2.3.10.1 of the PWS which explicitly stated that the contractor could "not swap, stake, pledge, hypothecate, borrow, invest, assign, convey, lend, or make other use of Government assets in the Contractor's possession." (*Id.* at 13 (quoting AR 155)).

The United States further asserts that the USMS's discussions with Wave were meaningful, "because they adequately allowed Wave to further amplify its proposed solution to allow USMS to determine whether Wave's proposal was indeed technically unacceptable for award." (Def.'s xMJAR at 13). First the United States highlights that, based on the discussions, the CO determined that "[Wave's] solution is not viable without major revisions to meet the requirements of the PWS[,]" specifically, it "lack[ed] a sufficient plan for cryptocurrency assets that are not traditionally supported by platforms like ▓▓▓ without some form of manipulation[.]" (AR 1976). Therefore, according to the United States, the USMS had no obligation to allow Wave to submit a revised proposal. (Def.'s xMJAR at 13 (citing FAR15.307(a))). The Court agrees.

To be meaningful, discussions must "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as

---

[12] It may be worth noting that Wave does not seem to dispute that it proposed an immediate swapping plan for unsupported assets. (*See* Pl.'s Resp. at 5 ("[T]he government acknowledges Wave proposed an immediate swapping plan, which was the very issue that the Agency found to create a deficiency.")).

specific as practical considerations permit." *D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 40 (2011) (internal citations omitted). This does not mean, however, that the agency must address "every matter at issue in the universe of information it can often consider." *Sterling Med. Assoc.'s, Inc. v. United States*, 177 Fed. Cl. 550, 562 (2025); *see also WorldTravelService v. United States*, 49 Fed Cl. 431, 439 (2001) (noting agency not required to "spoon feed" an offeror every item in need of revision to improve proposal.). Generally, a protestor should be given at least one meaningful opportunity to respond to significant weaknesses. *Sentrillion Corp. v. United States*, 114 Fed. Cl. 557, 570 (2014).

Wave's initial proposal included using "hardware wallets as an intake solution" for unsupported cryptocurrency assets. (AR 1525). However, as noted above, Wave was aware that these hardware wallets lacked adequate insurance coverage and were not included in SOC audits. (*Id.*). If the wallets had been properly insured and audited, assets stored in them could potentially have been recognized as "Qualified" custody under the PWS. Because they were not, the USMS identified this as a deficiency during discussions and specifically asked Wave to provide "any insurance options to meet the requirements of the PWS." (AR 1951). Rather than addressing this insurance gap directly, Wave abandoned the hardware wallet approach altogether and instead proposed a solution that relied primarily on swapping unsupported assets. (*See* AR 1951–54 ("[T]he use of custodial hardware wallets is no longer anticipated.")).

The Court finds that the USMS adequately identified the deficiencies in Wave's proposal. Although the Agency did not specifically flag Wave's asset-swapping approach during the initial round of discussions, it clearly advised that the proposed use of uninsured hardware wallets failed to meet the PWS requirements. As a result, the discussions were meaningful and satisfied the USMS's obligations under the FAR. *D & S Consultants, Inc.*, 101 Fed Cl. at 40 (citing FAR 15.306(d)(3)). While Wave's response to these concerns was ultimately inadequate, its alternative plan did not oblige the USMS to provide a second opportunity to revise its proposal. Wave was given a meaningful opportunity to respond and, therefore, its argument fails. *Sentrillion Corp.*, 114 Fed. Cl. at 570.

### 3.    The USMS's decisions were not prejudicial.

To obtain relief, after showing that the procuring agency violated the law or acted arbitrarily and capriciously, the protester must also demonstrate that the violation was prejudicial. Because Wave has failed to show that the USMS either engaged in misleading discussions or failed to conduct meaningful discussions, it cannot establish prejudice, and its claim fails on that basis. *See Glenn Def. Marine (ASIA)*, 720 F.3d at 907.

### C.  Disparate Treatment of Proposals

Wave next argues that the USMS engaged in disparate treatment of Wave's and ▆▆▆ proposals under Factor 2–Technical Rating and their overall capability ratings. (Pl.'s MJAR at 29–34). Wave claims that it received a "Low Confidence" rating and thus lost out on the contract award solely because its proposal "lack[ed] details of a sufficient plan for cryptocurrency assets that are not traditionally supported by platforms like ▆▆▆ without some form of manipulation." (*Id.* at 29 (citing AR 2054)). In comparison, when the USMS asked ▆▆▆ for details regarding unsupported assets, ▆▆▆ response stated that its "engineering group concluded that ▆▆▆

can provide cold storage by default intake and storage of all the listed Class 2 - 4 assets[.]" (AR 1769 (emphasis in original)). Wave argues that ███ response is an unsupported assertion and is no different than Wave's own position that "███ platform will support all assets, and there is no need for the swapping of assets prior to disposal or otherwise in order to meet the requirements outlined in the PWS." (Pl.'s MJAR at 30). Finally, Wave argues that the fact ███ was not the awardee matters not. (*Id.* at 33).

In response, the United States argues that Wave's proposal is materially distinguishable from ███. (Def.'s x MJAR at 14–17). Specifically, the United States points out that Wave proposed "the immediate swapping of non-supported assets" while ███ proposed to "provide cold storage by default intake and storage of all Class 2-4 assets as provided." (*Id.* (citing AR 2061)). Additionally, the United States points out that ███ also stated that "[n]ew cryptocurrency assets will be [assessed] Low/Medium/High Complexity and USMS will have to determine if it is fiscally worth requesting a supporting mechanism[,]" which suggests at least a rudimentary plan, albeit not fully developed. (*Id.* at 15–16 (citing AR 2061)). Lastly, the United States highlights that ███ plan was covered by the necessary insurance, unlike Wave. (*Id.* at 15 (citing AR 2077)).

The United States also argues that the TEB investigated Wave's claims regarding ███ ability to support all Class 2–4 assets but determined such a claim to be untrue. (Def.'s xMJAR at 16). Specifically, the TEB report stated:

> Wave's plan for custody was to swap assets that were not supported by their custodian for a cryptocurrency that is or liquidate for fiat. After disclosing this was not a viable resolution as previously indicated, Wave did not provide details of an alternate solution; only a conclusory statement that their custodian ███ could support all cryptocurrency assets categorized as Class 2-4. The list of supported assets on their custodian, ███, website ███ shows they do not support numerous cryptocurrency assets categorized as Class 2-4 (e.g., Bitcoin SV, Ark, VeThor, VeChain, Hashflow).

(AR 2070). As a result of this investigation, the United States argues that the TEB's low confidence determination was reasonable. (Def.'s xMJAR at 16).

Finally, the United States claims that even if the TEB had treated ███ and Wave's proposals the same regarding unsupported assets, Wave had additional deficiencies that merited a lower rating. (Def.'s xMJAR at 16). The United States points to the Source Selection Decision ("SSD") which included a matrix summarizing the ratings received by each offeror:



| | | | | CMDSS | Wave |
|---|---|---|---|---|---|
| **Facility & Staffing** | 1 | Phase in – Phase out Plan | S | H | S |
| | 2 | Workforce | H | S | H |
| | 3 | Insurance Coverage | S | S | L |
| | | **Overall** | **S** | **S** | **S** |
| **Security** | 1 | Security and Internal Control Protocols | S | S | S |
| | 2 | Logging and Controlling Assets | H | H | H |
| | 3 | Participation in Third-Party Audits | S | H | L |
| | | **Overall** | **S** | **S** | **L** |
| **Initial Intake** | 1 | Intake Process | S | H | L |
| | 2 | Platform Description | H | S | S |
| | 3 | Transfer Document Sample | H | H | H |
| | | **Overall** | **S** | **S** | **L** |
| **Storage & Management** | 1 | Cold Storage Methods | H | S | L |
| | 2 | Implementation of Crypto accounting plan | H | H | H |
| | 3 | Asset Management Solution | H | H | H |
| | 4 | Platform for Asset Monitoring | S | H | H |
| | 5 | Plan for Crypto Assets Upkeep | H | S | H |
| | | **Overall** | **H** | **H** | **L** |
| **Disposal** | 1 | Platform for asset liquidation | H | H | S |
| | 2 | Platform for asset return | H | H | L |
| | 3 | Plan for large Crypto Liquidation | S | S | S |
| | | **Overall** | **H** | **H** | **L** |
| **Resumes** | 1 | Key Personnel Resumes | H | S | H |
| | | **OVERALL** | **S** | **S** | **L** |

(AR 2077–78). Notably, in addition to its "Intake Process" rating, Wave received Low Confidence ratings in: (1) "Insurance Coverage" under facility and staffing; (2) "Participation in Third-Party Audits" under security; (3) and "Platform for asset return" under disposal. (*Id.*). The United States argues that any one of these additional ratings could justify Wave's lower rating.

To prevail on a disparate treatment claim, a protester must demonstrate that the agency unreasonably downgraded its proposal based on deficiencies that were substantively indistinguishable, or nearly identical, to those found in competing proposals. *Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 132 (2020) (quoting *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020)). However, "[w]hen a court is not convinced that the aspects of the proposals brought to its attention are indistinguishable for the purposes of the evaluation, then the exercise crosses the line and involves the second guessing of 'minutiae' which [the Court is] not allowed to undertake." *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).

Wave's continued attempts to convince the Court that its proposal is indistinguishable from ███████ is puzzling. Wave's proposal indicated that it would utilize "████ Qualified Custody Cold Wallets" to support the various assets it received. (AR 1525). The issue arises when discussing the unsupported assets. Wave proposed to utilize "custodial hardware wallets" for any assets "not supportable by ████ Qualified Custody Cold Wallets. (*Id.*). However, by

17

Wave's own admission, these "custodial hardware wallets . . . are not covered by ███ insurance policy nor included in SOC audits," and therefore cannot be classified as "Qualified" custody. (*Id.*). In practice, Wave is actually proposing that for any assets that do not fit within ███ "Qualified Custody Cold Wallet" framework, Wave would simply move them into a different, less secure storage method that lacks the required safeguards. Effectively, this concedes that Wave could not meet the Solicitation's qualified custody requirements for all assets, unless it relied on a prohibited strategy—immediate swapping. (*Id.* ("Wave will look to convert these assets . . . to supported assets as quickly as possible.")). This was not the same as ███ proposal.

███ proposal, on the other hand, stated that its default intake plan was cold storage. (AR 2061). ███ affirmed that it could "provide storage of all Class 2–4 assets as provided" without reservation and never indicated that there might be concerns with the assets being held in "Qualified" custody. (*Id.*). Wave's trouble arises from this set of facts. In its final round of discussions, Wave stated "there is no need for an alternative solution[]" because their subcontractor ███ "platform will support all assets, and there is no need for the swapping of assets prior to disposal or otherwise in order to meet the requirements outlined in the PWS." (AR 1971). As Wave contends, this response suffered from the same lack of detail as ███. The difference is, as identified earlier in this opinion, Wave's proposal had already informed the USMS that ███ would need to utilize unqualified storage for certain unsupported assets. (AR 1525). In other words, Wave's later assertion, that no alternative solution or asset swapping would be necessary, directly conflicted with the technical approach it had previously described.

By contrast, ███ did not present the agency with the same inconsistency. Its proposal consistently represented that all Class 2–4 assets could be maintained in qualified cold storage without resorting to interim, unqualified methods or conversion strategies. (AR 2061). Thus, while both offerors may have provided similarly concise responses during discussions, only Wave's response was undermined by contradictions in its own proposal. That distinction gave the agency a reasonable basis to view the proposals differently and warranted further investigation. Accordingly, the Court cannot agree that the proposals of Wave and ███ were substantively indistinguishable, thus Wave's unequal treatment claim must fail.

### D. Wave's Factor 1 Rating

Wave initially raised arguments that the USMS arbitrarily lowered its Factor 1 rating. (Pl.'s Mot. at 34–37). However, this argument has since been withdrawn. (Pl.'s Resp. at 18).

### E. Deviation from Evaluation Criteria Regarding Licensing

Wave also alleges that the USMS deviated from the terms of the Solicitation. (Pl.'s MJAR at 37–39). During the oral presentation portion of the procurement, the Solicitation required offerors to "[d]escribe how [their] system ensures compliance with regulations and laws related to the selling of cryptocurrency assets." (AR 134). Wave interprets this requirement as requiring offerors to demonstrate an ability to comply with the law, specifically the law pertaining to licensing. (Pl.'s MJAR at 17).

18

To set the stage for its argument, Wave first claims that "cryptocurrency assets . . . are securities" according to the SEC and case law. (*Id.*). Next, Wave points to the Investment Advisers Act of 1940 ("Advisers Act") which defines an "investment adviser" as:

> [A]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

(*Id.* at 38 (quoting 15 U.S.C. § 80b-2)). Relying on this definition, Wave contends that the Solicitation's requirements, such as directing the contractor to "recommend and advise on the proper classification of new cryptocurrencies seized" and to "make recommendations regarding the most prudent method of disposal[,]" bring the awardee within the scope of an "investment adviser" under the Advisers Act. (AR 151, 156).

From here, Wave argues that investment advisers must obtain appropriate licensure from the SEC under the Advisers Act and further notes that compliance may also involve state-specific regulatory requirements, such as money transmitter licenses ("MTLs").[13] (Pl.'s Mot. at 38). Wave further asserts that both CMDSS and ███ lacked the necessary licenses at the time of their proposals and could not reasonably obtain them before performance. (*Id.*). According to Wave, the USMS failed to adequately consider this issue in its evaluation.

The United States responds that submitting proof of licenses was not a requirement set forth in the Solicitation, and therefore offerors were not evaluated on whether they had obtained any particular license. (Def.'s xMJAR at 19). The United States further notes that Wave has failed to identify any provision in the Solicitation imposing a specific licensing requirement.

The Court finds Wave's argument relies on several assumptions: (1) that cryptocurrency assets are necessarily "securities" (2) that the Solicitation's advisory functions make the awardee an "investment adviser" under the Investment Advisers Act of 1940 and (3) that this, in turn, triggers specific SEC and state licensing requirements that the USMS was required to evaluate during the course of this procurement. Even if each step were plausible, Wave still faces a fundamental problem in procurement law, "that proposals must be evaluated in accordance with the terms of the solicitation[,]" not unstated requirements. *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 374 (2009). Wave has failed to identify any additional terms or provisions within the Solicitation that would cause this Court to change its decision issued during the preliminary injunction phase of this protest. *See Wave Digital Assets, LLC v. United States*, 2025 WL 2475370 at *6 (Fed. Cl. 2025). The Solicitation did not require proof of licensure and Wave

---

[13] Plaintiffs explain that MTLs "are state-specific regulatory requirements for businesses handling the transfer of money. (Pl.'s MJAR at 38).

cannot "invent evaluation criteria" to prove its point.[14] *Id.* Wave remains unsuccessful on this issue.

### F.  Organizational Conflict of Interest

Wave's final argument asserts that the USMS failed to properly evaluate an OCI stemming from CMDSS's teaming agreement with ███████████, which employed two former USMS officials, ████████████████████) and █████████████ ██████████).[15] (Pl.'s MJAR at 39–43; AR 1415). Wave contends that █████████ "personally and substantially participated in the preparation of this procurement," in violation of 18 U.S.C. § 207, and that this alleged conflict should have precluded the award to CMDSS. (Pl.'s MJAR at 41–42). The United States counters that the USMS properly identified a potential conflict, and its subsequent evaluation determined the risks to be minimal and thus did not require mitigation. (Def.'s xMJAR at 21–24).

Whether an offeror can perform a contract free from potential conflicts of interest generally rests with the CO. *See Axiom Res. Mgmt., Inc. v United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009) ("[T]he identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion."). Because these require fact-specific inquiries, the courts will give considerable deference to the CO. *See PAI Corp. v. United States*, 614 F.3d 1347, 1351–52 (Fed. Cir. 2010) (quoting *Axiom*, 564 F.3d at

---

[14] Plaintiffs also argue it violates "basic logic" that "an offeror could show its ability to comply with applicable laws and regulations without showing its required licenses or . . . [its] ability to acquire said licenses[.]" (Pl.'s Resp. at 20). But this contention reflects a fundamental misunderstanding: the solicitation did not require offerors to *show* or *demonstrate* their ability to comply, only to *describe how* they would do so. (AR 134).

[15] The teaming agreement sets forth and details the roles and responsibilities each of these individuals held during their employment with the USMS, as follows:



(███████████): Between 2013 and 2022, when she joined ███████████, ████████████ led the [USMS]'s Complex Assets Unit with responsibility for managing the custody, liquidation, and distribution of all digital assets for the U.S. Department of Justice.

(███████████): Immediately prior to joining ███████████, █ ████████████ ran International Operations for the [USMS], which included identifying and managing all assets located outside the contiguous United States (OCONUS) as well as advising on the creation of asset management agencies worldwide. ████████████ is also a World Bank Group and [United Nations Office on Drugs and Crime] subject matter expert for asset forfeiture and has co-authored the 2023 World Bank publication "Managing Seized and Confiscated Assets."

(AR 1415).

1382 (citing 48 C.F.R. § 9.505)). Furthermore, there is a "strong presumption that government officials act correctly, honestly, and in good faith when considering bids." *Savantage Fin. Servs., Inc. v. United States*, 86 Fed. Cl. 700, 703 (2009), *aff'd*, 595 F.3d 1282 (Fed. Cir. 2010). A protester must produce "hard facts" as "a mere inference or suspicion of an actual or apparent conflict is not enough" to show that a procurement has been compromised by an OCI. *Turner Const. Co., Inc. v. United States*, 645 F.3d 1377, 1387 (Fed. Cir. 2011) (quoting *PAI Corp.*, 614 F.3d at 1352).

A CO is responsible for identifying and assessing potential OCIs as early as possible in the acquisition process and for avoiding, neutralizing, or mitigating any significant conflicts before awarding the contract. FAR § 9.504(a). "A significant potential conflict is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders." *PAI Corp.*, 614 F.3d at 1352 (quoting *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 202 (2007)). What constitutes a significant potential conflict is under the CO's "considerable discretion[,]" and the CO is not required to document or submit a plan to neutralize any potential conflict deemed non-significant. *See McVey Co. v. United States*, 111 Fed. Cl. 387, 408 (2013) (quoting *PAI Corp.*, 614 F.3d at 1353).

The record reflects that the CO recognized ████████ and ████████ prior USMS employment, including that both joined ████████ shortly after leaving the agency without a formal "cooling-off" period; based on this, the CO conducted an OCI assessment in consultation with agency counsel and an ethics attorney.[16] (AR 80–82). That review found no evidence that either individual had: (1) contacted USMS personnel regarding the procurement; (2) access to competitively useful non-public information; and (3) an unfair advantage stemming from their prior roles, particularly given the revised PWS and the passage of time since earlier efforts. (AR 81). Based on these findings, the CO concluded that any potential conflict or competitive advantage posed only minimal risk. (AR 82).

Wave's subsequent protest at the GAO prompted the CO to conduct a second round of OCI assessments. (AR 2415–20). During this second investigation, the CO obtained sworn statements from the president of CMDSS and ████████, both of whom declared that neither ████████ nor its employees, including ████████, participated in the preparation of CMDSS's proposal. (AR 2415; 2418). The CO found that while ████████ had helped develop the original PWS prior to leaving the USMS, that document was publicly available and had since been substantially revised. (AR 2419). Additionally, the CO determined that the current PWS incorporated significant technical updates and introduced numerous new requirements, particularly in areas such as asset management, cybersecurity, personnel qualifications, and data security, which she determined to be "indicative of the rapidly evolving cryptocurrency environment." (*Id.*). This second investigation confirmed the CO's previous

---

[16] Because the Court previously addressed these OCI-related facts in a prior opinion, it provides only an abbreviated recitation here. *See Wave Digital Assets, LLC v. United States*, 2025 WL 2475370 at *6 (Fed. Cl. 2025).

determination that any prior familiarity with the original PWS did not provide a meaningful competitive advantage in connection with the current Solicitation. (AR 2420).

The CO investigated further to determine what role █████████ may have had in preparing CMDSS's proposal and produced the following timeline of events:

- 04/19/2024 – █████████ requests an oral presentation time slot.
- 05/03/2024 – █████████ informs CO it is serving as a subcontractor to █████████.
- 05/06/2024 – CMDSS' oral presentation.
- 05/09/2024 – █████ and █████████ oral presentation.
- 05/14/2024 – █████ receives notice of exclusion.
- 05/20/2024 – CMDSS and █████████ sign Teaming Agreement.
- 05/22/2024 – CMDSS submits proposal with █████████ as a Team Member.

(AR 2420). From this timeline, the CO determined that █████████ "was a last-minute addition to [the] CMDSS' team" and noted that neither █████████ nor █████████ were mentioned in either of CMDSS's oral presentation or its Factor 2 written proposal. (*Id.*).

The Court recognizes that these findings have already been addressed but, out of deference to Wave's continued arguments, it will briefly reiterate them. Wave emphasizes that █████████ was involved in creating the original Solicitation requirements. (Pl.'s Resp. at 22). The CO, however, found that those original requirement documents were publicly available. (AR 81, 2419). Although █████████ and █████████ previously served as technical evaluators with the TEB, the CO, after consulting with the Office of General Counsel, determined that their knowledge was limited to a "top-level" understanding, which posed minimal risk. (AR 81). While Wave criticizes the term "top-level knowledge" as providing "very little clarity," the practical effect is clear: neither individual had access to competitively useful, non-public information that could create an unfair advantage, and the CO reasonably concluded that the risks for a conflict of interest or unfair advantage were minimal.

In sum, the record demonstrates that the CO thoroughly identified and evaluated any potential OCI through multiple investigations, consultations with ethics and legal counsel, review of sworn statements, and careful consideration of the timing and scope of █████████ and █████████ prior USMS involvement. Wave has not produced any "hard facts" to demonstrate otherwise, relying instead on speculation and inference. Once again, Wave fails.

22

*G.    Wave Fails to Satisfy the Requirements for Injunctive Relief*

In conclusion, Wave asks the Court to either direct the USMS to terminate the contract with CMDSS and award it to Wave, or to declare the evaluation and award to CMDSS improper and conduct its own re-evaluation of Wave's and ████ proposals while excluding CMDSS due to the alleged OCI. (Pl.'s MJAR at 43–44). Because the Court has found in favor of the United States on all issues discussed, further analysis of this request is unnecessary, a point that Wave acknowledged in its Response. (Pl.'s Resp. at 25 ("[I]f this Court were to side with [the United States] on the above matters, there is no need to address this issue.")).

### III.    Conclusion

The juxtaposition of the legal propriety of this protest with alleged criminal conduct occurring in close temporal proximity is, at a minimum, notable. The implications extend beyond mere irony. As previously discussed, the Indictment includes a criminal forfeiture count, and the forfeited cryptocurrency is stored by the USMS pursuant to its contract with CMDSS—the same contractor whose employee is alleged to have engaged in the misconduct. The optics are undeniably poor, but the concern is not, as the government suggests, confined to optics alone. (Hr'g Tr. at 9:16–17). Even so, these considerations lie beyond what this protest permits the Court to resolve. The distinction between the Court's protest jurisdiction and contract administration is plain. The Court rules accordingly.

Wave fails to demonstrate any prejudicial error in this procurement such that relief could be awarded. For the reasons stated, Wave's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 42), is **DENIED**. The United States' and CMDSS's Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 48; Interv.-Def.'s xMJAR, ECF No. 47), are **GRANTED**. The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this Memorandum Opinion within **fourteen (14) days** of its entry to allow the Court to file a public version of the Opinion.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge